IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SYMANTEC CORPORATION,<br>a Delaware Corporation,<br><br>    Plaintiff,<br><br> v.<br><br>ERICH SPANGENBERG, an individual; and<br>IP NAVIGATION GROUP, LLC, a Texas Limited<br>Liability Company,<br><br>    Defendants. | C.A. No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR FRAUD AND NEGLIGENT MISREPRESENTATION

Plaintiff Symantec Corporation, by and through its undersigned counsel, alleges the following against Defendants Erich Spangenberg and IP Navigation Group, LLC.

## PARTIES

1. Plaintiff Symantec Corporation ("Symantec") is a Delaware corporation with its principal place of business at 350 Ellis Street, Mountain View, California 94043. Symantec is a technology company that produces software and support for data security and information management.

2. On information and belief, Defendant Erich Spangenberg ("Spangenberg") is an individual who can be located in Paris, France.

3. Defendant IP Navigation Group, LLC ("IP Nav") is a Texas limited liability company with its principal place of business at Chateau Plaza, 2515 McKinney Ave., Suite 1000, Dallas, Texas 75201. On information and belief, IP Nav was founded and is owned and controlled by Defendant Spangenberg.

4. Spangenberg and IP Nav shall be referred collectively herein as "Defendants."

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizens between the parties and the amount in controversy exceeds $75,000.

6. This Court has personal jurisdiction over Defendants and venue is proper within this District under 28 U.S.C. §§ 1391(b)(3), (c)(2) and (c)(3). Venue is also proper because, upon information and belief, Spangenberg resides outside the United States.

**GENERAL FACTUAL ALLEGATIONS SUPPORTING ALL CLAIMS FOR RELIEF**

**SPANGENBERG AND IP NAV NEGOTIATE THE ORIGINAL AGREEMENT**

7. Upon information and belief, IP Nav was founded in 2003 for the purpose of monetizing intellectual property. Spangenberg is the founder and Chairman of IP Nav. Defendants are well-known patent monetization entities. At one point, IP Nav had a global presence in the U.S., Europe and Asia, claimed to have generated hundreds of millions of dollars in licensing revenue, and boasted about its diverse client base from Fortune 500 companies to universities, as well as its extensive network of other monetizing entities and access to private equity funds. At relevant times herein, IP Nav employees or affiliates included Jennifer Watkins (General Counsel), Rick Sanchez (Director), Howard Goodman (CFO), David Pridham (CEO), and Jonathon Skeels (Director of Business Development).

8. Upon information and belief, in or around late 2011, Defendants approached Symantec to develop a patent monetization strategy. This was Symantec's first foray into patent monetization.

9. Defendants were the driving force behind the negotiations and requested that ownership of Symantec's patents be transferred to a separate holding company of Defendants' choosing that would be controlled by Defendants. While ownership of the patents would be held by this holding company, it was understood between the parties that Defendants would maintain control over the patents and holding company for monetization purposes to the benefit of all parties.

10. On February 28, 2012, Symantec entered into a Patent Purchase Agreement ("Original Agreement") with Defendants via a holding company originally named Stec IP, LLC, but whose name was later changed to Clouding IP LLC ("Clouding LLC"). The purpose of Clouding LLC was to monetize certain patents owned by Symantec ("Patents"). Under the terms of the Original Agreement, Symantec transferred to Clouding LLC some of its interest in the Patents. William J. Carter ("Carter"), the designated manager of Clouding LLC, executed the Original Agreement on behalf of Clouding LLC; however, Carter was not directly involved in any negotiations related to the Patents, but merely acted as a signatory of Clouding LLC for the benefit of Defendants.

11. Upon information and belief, Defendants directed the monetization efforts, including enforcement strategy, the communications with Clouding LLC's counsel, and the negotiations with enforcement targets. Upon information and belief, IP Nav and LSC Holdings, LLC, an affiliate of IP Nav, provided the funding for the enforcement efforts, including payment of expenses, and Clouding LLC did not directly fund any substantive enforcement efforts. In short, it was Defendants, not Clouding LLC, who were responsible for directing the monetization efforts associated with the Patents, including overseeing any of the related infringement litigation.

12. After entering into the Original Agreement, Clouding LLC began to undertake enforcement efforts under the guidance of Defendants. In connection with those enforcement efforts, Defendants remitted to Symantec two high-value payments (the first in November 2012 and the second in January 2013) pursuant to the terms of the Original Agreement. Payments pursuant to the Original Agreement were intermittent and dependent on Defendants' enforcement efforts. Symantec had no formal patent monetization system in place and relied upon Defendants to accurately and timely remit payments owed under the Original Agreement.

## DEFENDANTS INDUCE SYMANTEC INTO AMENDING THE ORIGINAL AGREEMENT

13. In 2013, however, certain developments in pending patent infringement litigations in the United States District Court for the District of Delaware provided the opportunity and motive for Defendants to defraud Symantec. Specifically, various third-party defendants in the pending enforcement litigations had begun filing legal motions challenging Clouding LLC's standing to enforce the Patents on the grounds that the Original Agreement did not transfer sufficient substantial rights to the Patents from Symantec to Clouding LLC. If those motions were meritorious, Clouding LLC arguably would lack standing to bring enforcement campaigns against third parties and would no longer be able to enforce the Patents under the Original Agreement.

14. During this time, Defendants were in the process of negotiating a settlement with RPX Corporation, a member-based patent risk management company which would provide a license to the Patents to many of the defendants in the Delaware litigations. As part of the RPX licensing deal, Defendants represented to Symantec that additional patents had to be transferred to Clouding LLC in order for RPX to agree to any license.

15. Based on Defendants' representations about RPX's settlement demands, Symantec agreed to transfer additional patents to Clouding LLC, which could then be licensed to RPX. Defendants represented that Symantec's share of royalties from an RPX settlement would be in the millions of dollars. On information and belief, Defendants and RPX reached a settlement in principle between Clouding LLC and RPX's clients involved in the pending lawsuits.

16. On July 28, 2014, the pending lawsuits initiated by Clouding LLC were dismissed after the United States District Court for the District of Delaware held that Clouding LLC did not possess sufficient substantive rights to the Patents and therefore lacked standing to bring suit on its own without joining Symantec ("Delaware Standing Decision"). As a result, the RPX deal

RLF1 18698587v.1

fell through; however, Defendants failed to inform Symantec of this development, but continued to maintain that Symantec must transfer additional patents to Clouding LLC.

17.   Defendants used the Delaware Standing Decision as an opportunity to execute the scheme to defraud Symantec. Defendants contacted Symantec about the possibility of amending the Original Agreement. Defendants did so with the intent of inducing Symantec to relinquish additional substantive interests in the Patents, which would allow Clouding LLC to transfer ownership of the Patents to Marathon Patent Group ("Marathon") without Symantec ever receiving compensation for its interests in the Patents.

18.   On information and belief, Defendants intentionally concealed this plan from Symantec, and instead represented to Symantec that amendment of the Original Agreement was only necessary to enable Clouding LLC to continue monetizing the Patents, including the addition of patents to close on the RPX settlement and license agreement. Defendants already knew, however, that RPX had withdrawn from the previous agreement in principle and, therefore, there would be no reason for Symantec to include any additional patents into any amended agreement.

19.   Based on Defendants' representations alleged above, on August 11, 2014, Symantec entered into the Amended and Restated Patent Purchase Agreement (hereinafter, "Amended Agreement"). Like before, Carter executed the Amended Agreement on behalf of Clouding LLC. The Amended Agreement included the additional patents that Defendants had represented were a necessary addition for the RPX deal. Had Symantec known that Defendants' settlement agreement with RPX had fallen through, however, Symantec would not have included those additional patents into the Amended Agreement.

### DEFENDANTS ARRANGE FOR MARATHON PATENT GROUP AND CLOUDING CORP TO ACQUIRE THE PATENTS

20.   Defendants and Marathon have close business ties that date back for years. Like Defendants, Marathon is a patent monetization entity and a publicly traded corporation under the

stock symbol MARA.  Douglas Croxall is Marathon's founder, CEO and serves on its Board of Directors, Francis Knuettel serves as CFO, and James Crawford serves as COO.

21. Defendants and Croxall have a long relationship spanning over a decade. According to Marathon's website, prior to Marathon, Croxall was the CEO and Chairman of Firepond.  While at Firepond, Croxall engaged IP Nav and generated approximately $90 million in licensing revenues from 2004 through 2009 based on Firepond's patents.

22. Likewise, Defendants and Marathon have a long term relationship.  For example, according to Marathon's SEC filings, in May 2013 Marathon entered into a nine-year advisory services agreement (the "Advisory Services Agreement") with IP Nav. The terms of the Advisory Services Agreement provide that, in consideration for its services as intellectual property licensing agent, Marathon will pay IP Nav between 10% and 20% of the gross proceeds of certain licensing campaigns.  Upon information and belief, Defendants act as an agent for Marathon with respect to any dealing involving the Patents.

23. According to Marathon's SEC filings, in May 2014 Marathon entered into an opportunity agreement (the "Marathon Opportunity Agreement") with Defendants.  The terms of the Marathon Opportunity Agreement provide that Marathon has the option to provide up to 50% of the funding for certain opportunities relating to licensing, intellectual property acquisitions and/or intellectual property enforcement actions by Spangenberg, IP Nav or any entity controlled by Spangenberg.

24. As another example, according to Marathon's SEC filings on May 2, 2014:

> [Marathon] completed the acquisition of certain ownership rights [] from TechDev, Granicus and SFF pursuant to the terms of three purchase agreements between: (i) [Marathon], TechDev, SFF and DA Acquisition LLC, a newly formed Texas limited liability company and wholly-owned subsidiary of [Marathon]; (ii) [Marathon], Granicus, SFF and IP Liquidity Ventures Acquisition LLC, a newly formed Delaware limited liability company and wholly-owned subsidiary of [Marathon]; and (iii) [Marathon], TechDev, SFF and Sarif Biomedical Acquisition LLC, a newly formed Delaware limited liability company and wholly-owned

subsidiary of [Marathon].  TechDev, SFF and Granicus are owned or controlled by Erich Spangenberg or family members or associates.

25. Upon information and belief, Spangenberg is a significant shareholder in Marathon.  According to SEC filings, in 2013, Spangenberg and his wife Audrey Spangenberg collectively owned 8 million shares of Marathon stock.  Moreover, according to Marathon's SEC filings on May 10, 2016:

> [Marathon] entered into an executive employment agreement with Erich Spangenberg ("Spangenberg Agreement") pursuant to which Spangenberg would serve as the Company's Director of Acquisitions, Licensing and Strategy.  As part of the consideration, [Marathon] agreed to grant Mr. Spangenberg a ten-year stock option to purchase an aggregate of 125,000 shares of Common Stock, with a strike price of $7.48 per share, vesting in twenty-four (24) equal installments on each monthly anniversary of the date of the Spangenberg Agreement.

26. Key IP Nav employees were subsequently employed by Marathon, including Jennifer Watkins, who became Marathon's Corporate Counsel, and Rick Sanchez, who became Marathon's Senior Vice President of Licensing overseeing all aspects of licensing.  Upon information and belief, Jennifer Watkins, Rick Sanchez and Howard Goodman were involved in the scheme to defraud Symantec, including managing the enforcement efforts related to the Patents.

27. Immediately after Symantec and Clouding LLC entered into the Amended Agreement, Defendants began arrangements for Clouding LLC to transfer the Patents to Marathon and Clouding Corp under the guise of an arms-length transaction.  Defendants failed to inform Symantec that the Patents had been transferred from Clouding LLC to Marathon and Clouding Corp.

28. Marathon's SEC documents state that its wholly-owned subsidiary Clouding Corp acquired the Patents from Clouding LLC:

> On August 29, 2014, [Marathon] entered into a patent purchase agreement (the "Clouding Agreement") between Clouding Corp., a Delaware corporation and a wholly owned subsidiary of [Marathon] ("Clouding") and Clouding IP, LLC, a Delaware limited liability company ("Clouding IP"), pursuant to which Clouding acquired a portfolio of patents from Clouding IP. Clouding owns patents related to network and data management technology.

29. Marathon's SEC documents state that it paid the $2.4 million cash purchase price for the Patents *to Clouding LLC*:

> [Marathon] paid Clouding [LLC] (i) $1.4 million in cash, (ii) $1.0 million in the form of a promissory note issued by [Marathon] that matures on October 31, 2014 . . . the promissory note was paid in full prior to October 31, 2014.

30. The Clouding Agreement included as an exhibit to Marathon's SEC filings lists Clouding LLC, Clouding Corp and Marathon as parties to the agreement. Also included as an exhibit to Marathon's SEC filings is a Common Interest Agreement between IP Nav, Clouding LLC and Clouding Corp, which demonstrates the close ties between the parties.

31. However contrary to Marathon's representation made in its SEC filings, upon information and belief, Clouding LLC did not receive any cash for the Patents, rather the $2.4 purchase money was paid *directly* to Defendants. Defendants merely used Clouding LLC as a pass through entity that upon information and belief had *de minimis* operating funds; rather, Defendants funded the enforcement activities and any enforcement funds received by Clouding LLC was passed through to Defendants.

32. On information and belief, the Clouding Agreement was not an arms-length transaction. Marathon and Clouding Corp did not pay Clouding LLC fair and adequate consideration for the Patents.

## AFTER TRANSFER OF THE PATENTS, DEFENDANTS NEGOTIATE ADDITIONAL LICENSES ON BEHALF OF CLOUDING CORP

33. <u>CA, Inc. Settlement and License Agreement</u>:  On July 26, 2013, Clouding LLC filed suit against CA, Inc. alleging infringement of certain Patents.  Upon information and belief, Defendants on behalf of Clouding LLC then initiated settlement discussions with CA, Inc.  Upon information and belief, the settlement discussions continued into mid-2014, including the exchange of a draft settlement agreement.

34. On July 28, 2014, the Delaware Standing Decision issued.  On August 29, 2014, Defendants transferred the Patents to Marathon and Clouding Corp.  On September 10, 2014, Clouding Corp refiled an action against CA, Inc.  Upon information and belief, Defendants reinitiated settlement discussions on behalf of Clouding Corp.

35. On October 30, 2014, according to Marathon's SEC filings, Clouding Corp entered into a settlement and licensing agreement with CA, Inc.  Defendants did not inform Symantec of the CA, Inc. settlement or remit any payment owed under the Amended Agreement.

36. <u>RPX Settlement and License Agreement</u>:  Before the Delaware Standing Decision issued, Defendants were also negotiating a high-value settlement with RPX, which represented numerous defendants in settlement negotiations.  Upon information and belief, the settlement discussions continued into mid-2014, including the exchange of a draft settlement agreement.  Defendants represented to Symantec that it would have to transfer additional patents to Clouding LLC before RPX would agree to any settlement, and promised millions to Symantec if the RPX deal closed.

37. Subsequently, the Delaware Standing Decision issued and upon information and belief, RPX walked away from the pending deal.  Defendants failed to tell Symantec that the RPX deal was no longer on the table, which obviated the need for Symantec to transfer additional patents.  Instead, based on Defendants' false representations and omissions, Symantec agreed to transfer additional patents to Clouding LLC.

38. Upon information and belief, once Defendants transferred the Patents to Marathon and Clouding Corp, Defendants resumed intensive negotiations with RPX and closed a settlement and licensing deal. According to Marathon's SEC documents, "[o]n September 30, 2014, Clouding Corp., a wholly owned subsidiary of [Marathon], entered into a Patent License and License Option Agreement with RPX." Defendants did not inform Symantec of the RPX settlement or remit any payment owed under the Amended Agreement.

39. <u>AT&T Settlement and License Agreement</u>: On July 26, 2013, Clouding LLC filed suit against AT&T Corp. ("AT&T") alleging infringement of certain Patents. Upon information and belief, Defendants on behalf of Clouding LLC then initiated settlement discussions with AT&T.

40. On July 28, 2014, the Delaware Standing Decision issued. On August 29, 2014, Defendants transferred the Patents to Marathon and Clouding Corp. On September 10, 2014, Clouding Corp refiled an action against AT&T. Upon information and belief, Defendants reinitiated settlement discussions on behalf of Clouding Corp.

41. On August 24, 2015, according to Marathon's SEC filings, Clouding Corp entered into a settlement and licensing agreement with AT&T. Defendants did not inform Symantec of the AT&T settlement or remit any payment owed under the Amended Agreement.

42. The Clouding Agreement also provides for future revenue payments to Clouding LLC. Marathon's SEC filing summarizes the future revenue payments as "(iv) fifty percent (50%) of the net recoveries (gross revenues minus certain defined expenses) in excess of $4.0 million in net revenues that [Marathon] makes with respect to the patents purchased from [Clouding LLC]." Upon information and belief, no payment was made to Clouding LLC for the funds received from the RPX, CA, Inc. and AT&T settlement and licensing deals; rather, any funds owed under the Clouding Agreement was paid directly to Defendants.

## SYMANTEC BELATEDLY LEARNS ABOUT
## THE TRANSFER OF OWNERSHIP OF THE PATENTS

43. Defendants and Marathon actively concealed from Symantec that Clouding LLC purportedly had transferred the Patents to Marathon and Clouding Corp in a putative arms-length transaction. Defendants and Marathon knew that if Symantec had been made aware that the Patents had been sold, and that there would be no settlement agreement between Clouding LLC and RPX, Symantec would have initiated legal action and challenged that alleged sale.

44. Because of Defendants' and Marathon's active concealment, Symantec continued to believe that Clouding LLC was continuing to enforce the Patents in infringement litigation. Indeed, Symantec did not learn of the transferred ownership of the Patents until nearly a year after its in-house legal counsel began an investigation.

45. Symantec learned for the first time in August 2015 that Clouding LLC had allegedly transferred the Patents in 2014. In an August 25, 2015 email, Jennifer Watkins, IP Nav Legal Counsel, represented that "IPNav has not worked with [Clouding LLC] for some time. [Clouding LLC] was sold and the IPNav engagement letter terminated. **We have not been involved since the sale in mid-2014**." (emphasis added). Ms. Watkins further stated, "As you have probably noticed from our website, IPNav has been mothballed and is basically going inactive."

46. Symantec's in-house counsel continued to try and obtain answers from Defendants. On September 16, 2015, Ms. Watkins doubled down on her misrepresentations stating, "I have checked with Erich [Spangenberg] again on this. After [Clouding LLC] was sold, IPNav was no longer involved. If you check the court records in Delaware, the case was dismissed on standing grounds. **We have no idea what happened after this** . . . . If you have additional questions, you should contact the owners." (emphasis added). Upon information and belief, Ms. Watkins's statements were patently false; indeed, Ms. Watkins and Defendants were deeply immersed with matters involving the Patents, including collecting enforcement revenue,

until at least the end of 2015. Ms. Watkins' denials were consistent with Defendants' efforts over the preceding year to conceal their fraudulent conduct from Symantec.

47. Upon information and belief, Defendants received over $5 million from Marathon and Clouding Corp as a result of the sale and/or enforcement activities related to the Patents.

## COUNT ONE: INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

48. Symantec hereby incorporates by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

49. IP Nav and Spangenberg omitted material information from Symantec in order to induce Symantec to enter into the Amended Agreement in August 2014, which would result in the alienation of Symantec's interests in the Patents. Among other things, Defendants knew that Symantec had agreed to include additional patents into the Amended Agreement based on Defendants' previous representations that those additional patents were necessary in order to effect a settlement agreement with RPX. Defendants, however, purposefully refrained from informing Symantec that RPX had elected to withdraw from any settlement with Clouding LLC after the Delaware Standing Decision was issued.

50. Defendants knew that if Symantec had known that RPX had withdrawn from the proposed settlement, Symantec would not have entered into the Amended Agreement. Nevertheless, Defendants continued to insist that Symantec include the additional patents in the Amended Agreement, in order to mislead Symantec into believing that the settlement with RPX was still active. Accordingly, Defendants purposefully omitted informing Symantec of the development with RPX so that Symantec would continue to enter into the Amended Agreement. Defendants engaged in these omissions because they knew and intended that Marathon and Clouding Corp would ultimately acquire the Patents and separately enter into a settlement agreement with RPX, which would result in no royalties being tendered to Symantec.

51. Symantec reasonably relied on the representations of Defendants when it entered into the Amended Agreement with Clouding LLC. Additionally, Defendants' omission of material information also induced Symantec into entering into the Amended Agreement.

52. Symantec has been harmed by Defendants' tortious conduct as the Patents have been sold, assigned, or transferred to Marathon and Clouding Corp without Symantec receiving the payment to which it is due.

53. As a direct and proximate result of its reasonable reliance on Defendants' representations, upon information and belief, Symantec has suffered damages in an amount according to proof to be determined at trial.

54. IP Nav and Spangenberg acted willfully, oppressively, maliciously, and in wanton and conscious disregard of the rights of Symantec, in engaging in their conspiracy to defraud Symantec. Therefore, punitive damages should be assessed against all Defendants in an amount that will be sufficient to discourage it and others from such fraudulent conduct in the future.

## COUNT TWO: NEGLIGENT MISREPRESENTATION

55. Symantec hereby incorporates by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

56. IP Nav and Spangenberg made material omissions to Symantec regarding the Amended Agreement. Among other things, Defendants represented to Symantec that it was necessary to include additional patents in the Amended Agreement so that Defendants could finalize the settlement with RPX. Defendants knew, or should have known, that these representations were untrue because RPX had already broken off settlement discussions with Defendants, yet failed to tell Symantec.

57. These representations were false, as IP Nav and Spangenberg knew that the inclusion of the patents would not result in any settlement between Clouding LLC and RPX.

58. As a result of these misrepresentations, Symantec was wrongly induced into entering into the Amended Agreement.

59. Symantec reasonably relied on Defendants' representations and agreements set forth in the Amended Agreement when it entered into the Amended Agreement with Clouding LLC.

60. Symantec has been harmed by Defendants' tortious conduct as the Patents, including the additional patents, have been sold, assigned, or transferred to Marathon and Clouding Corp without Symantec receiving the payment to which it is due.

61. As a direct and proximate result of its reasonable reliance on these representations, upon information and belief, Symantec has suffered damages in an amount according to proof to be determined at trial.

## **PRAYER FOR RELIEF**

Wherefore, Symantec prays for judgment against Defendants as follows:

1. That the Court enter judgment in favor of Symantec on all counts;

2. That the Court award Symantec all of its damages associated with each claim in this complaint, including incidental and consequential damages flowing from Defendants' conduct;

3. For punitive damages;

4. For reasonable costs and attorneys' fees; and

5. For such other and further relief as the Court may deem proper.

**OF COUNSEL:**

Eugene Hahm
Heather F. Auyang
LTL ATTORNEYS LLP
601 Gateway Boulevard, Suite 1010
South San Francisco, California 94080

Dated: December 29, 2017

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7705
Farnan@rlf.com

*Attorneys for Plaintiff Symantec Corporation*